SIERRA CLUB, Appellee,

Hawkeye Fly Fishing Association,
Intervenor–Appellee,

v.

WAYNE WEBER LLC, Appellant.

No. 03–0654.

Supreme Court of Iowa.

Dec. 3, 2004.

Eldon McAfee of Beving, Swanson & Forrest, P.C., Des Moines, for appellant.

Wallace L. Taylor, Cedar Rapids, for appellee Sierra Club.

Philip H. Dorff of Hopkins & Huebner, P.C., Des Moines, for intervenor-appellee Hawkeye Fly Fishing Association.

Paul S. Swinton of Morain, Burlington & Pugh, P.L.C., West Des Moines, for ami-

cus curiae Iowa Pork Producer's Association.

Christina L. Gruenhagen, West Des Moines, for amicus curiae Farm Bureau Federation.

CARTER, Justice.

Wayne Weber LLC (Weber), a livestock producer, appeals from a decree enforcing a mediated settlement of a nuisance action and other claims seeking injunctive relief against the spreading of manure by Weber. The appellees are Sierra Club, the plaintiff in the nuisance action, and Hawkeye Fly Fishing Association, an organization that intervened and joined in Sierra Club's claims for relief. After reviewing the record and considering the arguments presented, we affirm the district court's decree.

In early 1998, Weber contracted with Murphy of Iowa, Inc. (Murphy), a corporation that sold hogs to meatpackers. The contract contemplated that Weber would construct three confinement finishing buildings and accompanying manure storage structures on its land in Allamakee County to be used in the production of hogs owned by Murphy and Stoecker Farms, Inc.

The confinement facilities began operating in November 1998. Each confinement facility houses 1100 head of finishing hogs. Manure storage facilities are adjacent to the confinement buildings. The manure in these structures has been applied to croplands near the confinement facilities after the crops have been harvested. The fields where the manure has been applied are in the watershed of French Creek. French Creek is a popular trout stream managed by the Iowa Department of Natural Resources (DNR).

Weber consulted with DNR with respect to construction of these confinement facilities. DNR concluded that Weber did not need to obtain a National Pollutant Discharge Elimination System (NPDES) permit for the project because the facilities were designed so as to never discharge manure.

In September 1999, Sierra Club and persons who own property near Weber's hog confinement facilities filed an action against Weber, Murphy, and Stoecker Farms, asserting common-law and statutory nuisance claims, violation of the public-trust doctrine, trespass, and negligence.[1] An additional claim in the nature of a citizens' action was asserted pursuant to Iowa Code section 455B.111 (1999). In June 2000, Hawkeye Fly Fishing Association intervened in the action and joined in Sierra Club's claims. In addition to the claims we have described, Sierra Club and the intervenor urged the court to determine that the DNR acted improperly in failing to require an NPDES permit for these facilities.

Weber filed a motion for summary judgment with respect to the permit issue, and the motion was granted by the district court. Trial of the other issues was set to commence on July 9, 2002. Approximately three weeks prior thereto the parties participated in mediation. At the conclusion of the mediation, the parties acknowledged their agreement to a resolution of the issues and dictated their understanding of that agreement as part of a tape-recorded record.

The parties of the present appeal agree that the substance of their mediated

---

1. Neither the individual plaintiffs nor Murphy and Stoecker Farms, Inc. are parties to this appeal.

agreement was to be incorporated in a consent decree. In an effort to carry out that understanding, Sierra Club and the intervenor presented a proposed decree. Weber then submitted a contrasting decree that interpreted the settlement agreement differently. Sierra Club and the intervenor then filed a motion requesting that the court adopt their version of the settlement agreement. After receiving evidence concerning the proposed buffer areas, the district court concluded that the decree proposed by Sierra Club and the intervenor represented the agreement of the parties and entered a decree corresponding with that which they proposed.

The provisions of the decree to which Weber objects in whole or in part are as follows:

1. No waste from the hog confinement operation at issue in this case, or from any other source, will be applied to the parcel of land in section 24 of the French Creek Township, Allamakee County, designated as Parcel No. 2 on the map attached to this Decree, from and after the date this Decree is entered.

2. The aforementioned Parcel No. 2 may continue to be planted in row crops, but Weber shall install a buffer strip 200 feet in width along the south and west sides of the parcel. The buffer strip on the west side of Parcel No. 2 shall be installed where Parcel No. 2 drains to the west onto the adjacent property. This buffer strip shall contain prairie grasses that are deep-rooted and will maximize soil retention and water infiltration, and will be installed and managed for the primary purpose of protecting French Creek from runoff and soil erosion from parcel No. 2.

In lieu of installing 200–foot wide prairie grass buffers, Weber may at his discretion, plant the 100–foot portion of the buffer strips adjacent to the crop fields in bromegrass, which is not a prairie grass, with the remaining 100 feet closest to French Creek planted in a deep-rooted warm-season prairie grass. Weber will be allowed to hay the bromegrass area as long as a minimum height of 6 inches is maintained. No livestock grazing will be conducted on this buffer strip. Implementation and management practices recommended by NRCS will be followed to install the buffers, to keep the bromegrass from encroaching into the prairie grass portion of the buffer strip, and to ensure the quality and integrity of the buffer strips.

No waste will be applied to the buffer strips.

3. Waste from the aforementioned hog confinement operation may continue to be applied to the parcels of land in sections 13 and 18 of French Creek Township designated as Parcel No. 1 on the map attached to this Decree.

4. The aforementioned Parcel No. 1 may continue to be planted in row crops, but Weber shall install a buffer strip 200 feet in width on the north and west boundaries of Parcel No. 1, as noted on the map attached to this Decree. The total 200 feet of buffer may include any grass areas located on land adjacent to the areas of Parcel No. 1 required to have a buffer strip. This buffer strip shall consist of prairie grasses that are deep-rooted and will maximize soil retention and water infiltration, and will be installed and managed for the primary purpose of protecting French Creek from runoff and soil erosion from Parcel No. 1.

In lieu of installing 200–foot wide prairie grass buffers, Weber may at his discretion plant the 100–foot portion of the buffer strips adjacent to the crop fields in bromegrass, which is not a

prairie grass, with the remaining 100 feet planted in a deep-rooted warm-season prairie grass. Weber will be allowed to hay the bromegrass area as long as a minimum height of 6 inches is maintained. Livestock grazing, using established good management practices (rotational grazing or flash grazing) as recommended by NRCS may be conducted on the bromegrass strips, and proper fence will be installed and maintained to keep livestock out of the prairie grass areas. Implementation and management practices recommended by NRCS will be followed to install the buffers, to keep the bromegrass from encroaching into the prairie grass portion of the buffer strips, and to ensure the quality and integrity of the buffer strips.

No waste will be applied to the buffer strips.

. . . .

6. Weber will not apply waste from the aforementioned hog confinement operation, or from any other source, to any other or additional parcels of land that are west of the aforementioned parcels 1 and 2. It is anticipated by the court that any such further or additional parcels would be outside the French Creek watershed, with the exception of a location immediately to the east of Parcel No. 1.

The map to which reference is made in the decree is shown below.

Although the district court refers to its decree as a consent decree, it was clearly not such. It was a decree resolving a dispute concerning the terms of the settlement agreement. Weber argues that it did not agree to several of the restrictions contained in the court's decree. It contends it did not agree that the cover to be planted on the 200–foot buffer strips could not be bromegrass or that it could not harvest hay from the buffer areas nor graze livestock thereon. Weber also asserts that it did not agree to refrain from applying manure on the buffer strips required for parcel 1 or not to apply manure from other sources in the areas prohibited by the decree. Finally, Weber disputes the provisions relating to locating a portion of the buffer area on land adjacent to the areas required to have a buffer strip. We

will separately discuss each of these contentions. Other facts of importance will be provided in our discussion of the legal issues presented on the appeal.

## I. Scope of Review.

█ This is an action to interpret and enforce by way of prospective injunctive relief an oral agreement dictated into the record of the mediation proceeding and, as such, is an ordinary action to be reviewed for errors at law. Iowa Code § 611.3 (2001); Iowa R.App. P. 6.4.

## II. Standards for Interpreting Settlement Agreements.

█ Settlement agreements are essentially contracts, and general principles of contract law apply to their creation and interpretation. *City of Dubuque v. Iowa Trust,* 587 N.W.2d 216, 221 (Iowa 1998); *Fees v. Mut. Fire & Auto. Ins. Co.,* 490 N.W.2d 55, 58 (Iowa 1992). The intent of the parties controls the interpretation issues. *Magina v. Bartlett,* 582 N.W.2d 159, 163 (Iowa 1998). In order to be bound, the contracting parties must manifest their mutual assent to the terms sought to be enforced. *Kristerin Dev. Co. v. Granson Inv.,* 394 N.W.2d 325, 331 (Iowa 1986).

## III. Weber's Arguments.

█ The district court's decree mandates that the buffer strips on both parcel 1 and parcel 2 shall contain prairie grasses that are deep-rooted with the alternative that Weber, at its discretion, may choose to only plant prairie grass on that half of the buffer strips closest to French Creek and plant bromegrass on the half of the buffer strips adjacent to his crop fields. Weber contends that it did not agree that bromegrass could not be utilized on the entire portion of both buffer strips. That practice, it urges, would constitute an acceptable conservation practice sufficient to satisfy the purposes of the mediated settlement agreement. When Weber objected to the proposed requirement for deep-rooted prairie grass cover for the buffer areas in the district court, that court received evidence concerning the relative conservation advantages of prairie grass over bromegrass. This data supports a finding that prairie grass is clearly preferable to bromegrass for the purposes of preventing runoff and erosion. It also established that bromegrass is not a type of prairie grass. The parties' agreement, as it was tape-recorded at the conclusion of the mediation session, expressly provided that a "form of plant that is deep rooted of a prairie variety which will maximize soil retention and water infiltration" must be employed.[2] We are convinced that the

---

**2.** The tape-recorded agreement was as follows:

[Intervenor's Counsel]: The settlement reached today will be consummated by virtue of a written agreement, but the purpose of this dictation is to temporarily memorialize those terms. The parcel referred to as 24 in the French Creek water shed, Mr. Weber and Prestige Stecker have agreed will not be used for spreading manure. It will continue to be row cropped. However, there will be a 200 foot buffer of a grass or some other form of plant that is deep rooted of a prairie variety which will maximize soil retention and water infiltration. Those buffers will be located on the south side of

Parcel 24 and on the west side of Parcel 24. With respect to the property that we have referred to as the home place, that is the homestead of Mr. and Mrs. Weber, the agreement that was reached is that there will be a 200 foot buffer strip of plant material as previously identified planted on the, it is difficult to describe, but on Exhibit 1 we have outlined the area on which that will be planted.

[Weber's Counsel]: That may also be referred, on the previous description of the 200 foot buffer on the Section 24 parcel, that that is also shown on Exhibit 1.

[Intervenor's Counsel]: That is correct. Both of the buffers are referred to on Parcel

district court's action in requiring the use of prairie grass was consistent with the agreement of the parties.

█ The provisions in paragraphs 2 and 4 that authorize Weber at its discretion to plant bromegrass on that half of the buffer strips farthest removed from French Creek was inserted in the decree as the result of Sierra Club and the intervenor having proposed that disposition as an offer of compromise. Because Weber did not agree to this proposed compromise, the district court's inclusion of the partial bromegrass alternative in the decree seems to have treated Weber more favorably than it was entitled to be treated under the terms of the agreement that specifically called for prairie grass. However, because Sierra Club and the intervenor have not challenged the half bromegrass alternative, that provision of the decree will stand.

█ Weber next argues that it did not agree to restrictions on harvesting forage from the buffer strips or restrictions against spreading manure thereon. In examining the record made with respect to whether bromegrass should have been allowed for the cover of the buffer areas, it appears that Weber's argument in the district court with respect to harvesting hay was directed entirely to the proposition that he should be permitted to plant the entire portion of both buffer areas in bromegrass. The record indicated that the deep-rooted prairie grasses required by the decree would not be suitable for forage in any event. If Weber elects the one-half bromegrass alternative, it is permitted to harvest the bromegrass from the buffer strips subject to the six-inch limitation provided in the decree. There is no express provision in the decree prohibiting it from cutting the prairie grass, but given the terms of the agreement, this may not be done if it disturbs the effectiveness of the buffer strip for purposes of preventing runoff and erosion. This is consistent with the parties' agreement.

Although there is no express mention in the tape-recorded memorialization of the

24 on Exhibit 1. It appears from the topographical map of the French Creek water shed that any further spreading of manure will occur outside of the French Creek water shed with the exception of a piece of property located immediately to the east of the homestead property of Mr. and Mrs. Weber. Counsel for the Webers has indicated that there will be no (recording interrupted)
[Intervenor's Counsel]: Prior to the interruption we were discussing an area of land immediately to the east of the Weber homestead where manure will be applied to make up for the manure that will not be applied on Parcel 24. Counsel for the Webers has indicated that under no circumstances would manure be spread on fields situated closer to French Creek than the homestead area of the Webers. Is that the correct statement, Eldon?
[Weber's Counsel]: Yes, I believe so.
[Weber's Counsel]: Is that correct?
Wayne Weber: I am kind of lost. What is meant by the homestead?

[Weber's Counsel]: The property where you live. No manure application will occur closer to the property, to the French Creek, than the property where you live right now.
Wayne Weber: I am kind of confused.
[Intervenor's Counsel]: We are back on the record after a brief discussion concerning the issue of spreading of manure in fields located in the French Creek water shed. The parties I believe have agreed now that there will be no manure spread except to those areas east of Section 24 and the home place in Allamakee county. Further, the terms and provisions of the settlement will be converted into a consent decree as quickly as possible. I should also mention on behalf of HFFA that the settlement we have agreed here to today is contingent upon the approval of the Board of Directors of Hawkeye Fly Fishing Association. With that I will turn it over to other counsel.
Counsel for all other parties ratified the agreement, as did their principals upon the submission and review of same.

mediated agreement of a prohibition against the spreading of manure on the buffer strip required for parcel 1, to allow this to occur would clearly contravene the manifest purpose of requiring a buffer strip between areas where manure will be spread and the French Creek watershed. We believe such a prohibition is to be inferred from the context of the agreement and was properly included in the court's decree. The Restatement (Second) of Contracts speaks to this matter as follows:

> [T]he actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon. In such cases courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain.

> An offer which appears to be indefinite may be given precision by usage of trade or by course of dealing between the parties. Terms may be supplied by factual implication, and in recurring situations the law often supplies a term in the absence of agreement to the contrary.

Restatement (Second) of Contracts § 33 cmt. a (1979). We believe this principle supports the district court's action in prohibiting the spreading of manure on the buffer area required for parcel 1 and, in addition, supports the restrictions against grazing on the buffer strips.

■ Weber contends that it only agreed that manure from the confinement facilities subject to the litigation could not be spread in the prohibited areas and that the agreement was not intended to preclude the spreading of manure from other sources. We agree with the district court that to allow this to happen would be completely inconsistent with the purpose of the settlement agreement. Moreover, the tape-recorded memorialization of the agreement provides "there will be no manure spread except to those areas east of section 24 and the home place." [3] We are unable to interpret this language as only referring to manure from the facilities involved in the litigation.

■ As a final matter, Weber argues that the provision in paragraph 4 of the decree, which provides that "the total 200 feet of buffer may include any grass areas located on land adjacent to the areas of Parcel No. 1 required to have a buffer strip" unduly seeks to burden land owned by persons who are not parties to the agreement. This provision in the decree provides an opportunity for Weber to maximize its tillable acres by placing the buffer strips on adjacent land. Of course, this may only be accomplished with the consent of those who own the adjacent property. Those owners will only be burdened if they agree to the conditions that must be maintained for the buffer strips. If they do not agree, the strips must be placed on Weber's property.

## IV. *Appeal by Sierra Club and Intervenor.*

■ Sierra Club and the intervenor attempt to appeal from the district court's grant of partial summary judgment rejecting their claim that Weber was required to have an NPDES permit. Any opportunity to now challenge that ruling is foreclosed by the terms of the proposed decree proffered to the court by Sierra Club and the intervenor and ultimately incorporated in the court's final judgment. Those terms included the following:

**3.** This is the location designated in paragraph 3 of the decree as "the parcels of land in sections 13 and 18."

Upon the entry of this Decree by the court, this Decree shall constitute a complete and final settlement of all claims which were asserted, or could have been asserted, by Sierra Club and Hawkeye Fly Fishing Association against the Defendants in this case.

This unambiguous language applies to all claims in the litigation, including the claim involving the need for Weber to obtain an NPDES permit.

We have considered all issues presented and conclude that the district court's decree should be affirmed in all respects.

**AFFIRMED.**

All justices concur except LARSON, J., who takes no part.