# IN THE SUPREME COURT OF IOWA

No. 16–0649

Filed April 7, 2017

**ESTATE OF MICHAEL G. COX II** by Executors, **JOLEEN COX** and **MICHAEL G. COX SR.,** and **JOLEEN COX,** Individually and **MICHAEL G. COX SR.,** Individually.

Appellants,

vs.

**DUNAKEY & KLATT, P.C.** n/k/a **KLATT, ODEKIRK, AUGUSTINE, SAYER, TREINEN & RASTEDE, P.C.,**

Appellee.

Appeal from the Iowa District Court for Black Hawk County, Richard D. Stochl (trial judge) and Kellyann M. Lekar (order denying plaintiffs' motion for out-of-district judge), Judges.

Plaintiffs appeal a district court order granting the defendant's motion to enforce a settlement agreement. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Marc S. Harding of Harding Law Office, Des Moines, for appellants.

Thomas J. Joensen and Catherine M. Lucas of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellee.

**MANSFIELD, Justice.**

In this case, we are asked to determine whether the parties in a legal malpractice case entered into a binding settlement agreement, and if so, whether the settlement's confidentiality provision would result in a violation of our rules of professional conduct. Here, following mediation, the parties agreed on what would be paid to settle the case. They also exchanged versions of a confidentiality provision to be included in the settlement agreement, although they never settled on the same version at the same time. The defendant law firm nonetheless asked the district court to enforce the settlement.

Following a hearing, the court concluded that the parties had reached a final settlement and dismissed the underlying malpractice case. Plaintiffs now appeal, arguing (1) there was no meeting of the minds on settlement; (2) the confidentiality provision in the settlement as approved by the district court restricts the right of plaintiffs' counsel to practice law in violation of Iowa Rule of Professional Conduct 32:5.6(b); (3) the court had no authority to seal documents relating to the settlement; and (4) because the defendant law firm practices primarily in Black Hawk County, this case should have been heard by a judge from a different judicial district.

For the reasons discussed below, we hold that the parties never mutually assented to the same settlement agreement. We therefore do not reach the question whether a confidentiality provision requiring the attorneys not to disclose the existence and terms of the settlement may violate Iowa Rule of Professional Conduct 32:5.6(b). We also conclude the district court did not abuse its discretion in sealing documents related to the parties' mediation and follow-up negotiations or in declining to arrange for an out-of-district judge to preside over the case.

Accordingly, we reverse the judgment enforcing the settlement, we affirm the court's orders sealing portions of the file and declining to arrange for an out-of-district judge, and we remand for further proceedings.

## I. Background Facts and Proceedings.

**A. The Malpractice Suit.** This legal malpractice case arises from work performed by the Dunakey & Klatt law firm for Michael Cox II. The law firm is based in Waterloo and regularly practices in Black Hawk County. In early 2010, the law firm drafted a prenuptial agreement purporting to waive the rights of Cox's future spouse to Cox's 401(k) plan. The prenuptial agreement was executed, and approximately fourteen months later, a petition for dissolution of marriage was filed. However, before the divorce was finalized, Cox died in May 2011. A dispute arose as to whether the prenuptial agreement operated as a valid waiver of spousal rights to the 401(k) account. The matter was litigated in the federal courts, and ultimately any waiver was determined to be ineffective. Hence, the 401(k) account passed to Cox's widow rather than his parents.

In February 2014, Michael Cox II's parents, Michael and Joleen, filed this action for legal malpractice against the law firm and the two attorneys in the firm who had worked on the prenuptial agreement.[1] Although the action was brought in Bremer County, the parties jointly requested the matter be transferred to Black Hawk County. In November, a district judge who regularly offices in Chickasaw County was assigned to preside over the case.

---

[1]The Coxes later dismissed their claims against the two individual attorneys.

**B. Mediation and Settlement Negotiations.** In May 2015, after several months of discovery had occurred and a motion for summary judgment had been filed by the law firm, the parties agreed to mediate their dispute. On May 29, Michael and Joleen Cox attended the mediation session along with their attorney, Marc Harding. Troy Miller, an insurance claims adjuster, appeared on behalf of the law firm's insurer. The parties did not reach a settlement during the mediation; however, Harding, Miller, and the law firm's attorney, Tom Joensen, agreed to continue working with the mediator in the ensuing days to try to resolve the case.

On June 4, the court received an email from Joensen stating his understanding that the case had settled. Harding replied, disputing that the case had settled and instead noting that the parties still disagreed whether a confidentiality provision would be included in the agreement. Nevertheless, Harding wrote he was "cautiously optimistic [the case] will resolve."

Following that correspondence with the court, a series of emails was sent among Harding, Miller, and Joensen discussing the possibility of including a confidentiality provision in the settlement agreement. Harding wrote that the Coxes "would be willing to enter into a bilateral confidentiality agreement on the amounts paid only, subject to disclosure for tax purposes and if ordered by a court." Harding indicated that if the scope of the confidentiality agreement were any broader, it may cause tax and ethical implications. Several more emails were sent on this subject. Finally, late on June 4, Miller wrote to Harding:

> I've attached a couple of releases but need to have approval of my insured as well. Once you review them if you have any issues with them please return with any proposed

alternative language and I can run it by [Joensen] and my insured for approval.

> Pursuant to our discussion, please replace paragraph 15 of the settlement with the exact language from your shorter release, reading as follows:

> The existence and terms of this Release shall be and remain confidential between the parties hereto and shall not be disclosed by Releasors, except as required by law or order of court, without the prior written consent of each of the named Releasees, which consent may be withheld for any reason whatsoever. The parties agree that the terms of this settlement may be disclosed to any Court, (only) as required by law.

> We would also agree to an additional line that Plaintiffs are permitted to state that the matter has been concluded to their satisfaction or similar language.

Several hours later, still on June 5, Joensen emailed Harding a document titled "SETTLEMENT AND FULL AND FINAL RELEASE," which incorporated the confidentiality language requested by Harding. Joensen wrote, "Let us know if you agree to this document." Miller added that he would "of course need to have [his] insured's OK as well," to which Joensen replied that he "fully expect[ed] them to agree to it, but that is one last moving piece."

Ten days then passed while Harding was away on a Boy Scout trip to the Boundary Waters. Having returned on June 15, Harding replied that "the Settlement and Full and Final Release, as revised, is agreeable." However, at that point, the law firm had not confirmed acceptance of the settlement.

Instead, on June 16, Joensen emailed Harding a different version of the settlement, which included changes to the confidentiality provision. Although the provision previously stated that the settlement

"shall not be disclosed by Releasors" (the Coxes), the new language provided that the settlement "shall not be disclosed by Releasors, their agents, assigns, wards, executors, successors, administrators, and attorneys." Joensen wrote that it was Harding's decision "whether you have your clients sign" this second version.

Early on June 17, Harding wrote back. He objected to the new language, maintaining that it was overly broad and unethical. Harding stated that the Coxes "want the June 5 agreement which complies with the [ethical] Rule by 2 pm, or they want to try the case."

At 11:34 a.m. that day, Joensen responded. He questioned why the parties would proceed to trial if they had already agreed to a settlement on June 15. He offered to remove the word "attorneys" but not the word "agents," and insisted that " 'agents' includes, in its definition, attorneys."

Joensen did not respond further by 2 p.m. and, at 3:55 p.m., the Coxes filed a motion to set a new trial date. The Coxes' motion stated there had been "no meeting of the minds" on the proposed settlement agreement.

In response, the law firm promptly filed a motion to enforce a settlement agreement. The law firm did not identify *which* version of the settlement agreement it believed the parties had agreed on, but stated that the "[t]he Plaintiffs' concerns regarding the Confidentiality Agreement are unfounded."

Several days later, the law firm filed an additional motion requesting that the court seal all transcripts, exhibits, and filings related to its motion to enforce the settlement. The law firm asserted that its request was necessary "to prevent the *de facto* disclosure of the very matters the settlement agreement is intended to keep confidential."

**C. Sealing the Settlement Documents.** On August 21, the court held a hearing on the motion to seal court filings. The law firm reiterated that its request was limited to pleadings or information related to settlement negotiations and mediation.

After argument, the court decided to set a one-day evidentiary hearing on the motion to enforce the settlement and, in the interim, granted the law firm's motion to seal:

> Essentially I'm establishing a confidentiality agreement or a confidentiality order as to the specifics of the settlement negotiations. And I will seal those pleadings involving that only during the pendency until I make a decision on that other.

When Harding asked for clarification, the court continued:

> THE COURT: You can talk to your partners. You can talk to anybody involved in this. Of course you can.
>
> MR. HARDING: Yeah. I thought that that was the case but --
>
> THE COURT: I just don't --
>
> . . . .
>
> THE COURT: And I don't want your clients going home today and saying, well, we had a big hearing today on the issue. They agreed to pay us X number of dollars --
>
> MR. HARDING: Yeah.
>
> THE COURT: -- but they won't agree to these terms and conditions, and the next thing you know, it's all blown up.

**D. Out-of-District Judge.** Before the hearing on the settlement agreement, the Coxes filed a motion requesting appointment of an out-of-district judge to preside over the remainder of the case. The motion urged that a new judge was needed because of the frequency in which the defendant law firm practiced in front of First Judicial District judges.

The Coxes also noted that one of the law firm's attorneys had recently been appointed a judge in the First Judicial District, which "increases the likelihood that a judge of the First Judicial District may be perceived to have a bias in favor of the Defendant." The Coxes argued that reassignment of judges from different districts is "a common practice across Iowa" where a party has frequent or significant contact with the judges of a particular district, even "without any allegation or finding of bias or partiality."

A hearing on that motion took place on October 26 before the chief judge of the First Judicial District. The Coxes insisted that the existing assignment of a First District judge left them in a "no-win situation." They questioned why an out-of-district judge could not be brought in to preside over the case. In response, the law firm noted the absence of any claim that the assigned judge had shown partiality or favoritism. The chief judge acknowledged that in cases involving legal malpractice or a law firm as a party, it is a fairly regular practice within the First Judicial District to assign a judge who has had limited contact with the law firm.

Still, the chief judge denied the Coxes' request. The court observed in its written ruling that the assigned judge had been initially chosen in part because his principal office was located in Chickasaw County rather than Black Hawk County. In the court's view, this assignment had avoided any potential appearance of impropriety resulting from a Black Hawk County law firm defendant and a presiding Black Hawk County judge. According to the court, the plaintiffs had presented no compelling evidence that the assigned judge could not fairly and reasonably preside over the matter. It concluded the existing special assignment "was appropriate at the time of the assignment and remains appropriate at the present time."

**E. Hearing on the Settlement Agreement.** On February 12, 2016, the previously assigned judge held a hearing on the enforceability of the settlement. There, the law firm indicated for the first time that it was agreeable to the plaintiffs' June 5 language that required only "the parties" to keep the settlement confidential. At the same time, the law firm argued this language would also be binding on the plaintiffs' attorney. Meanwhile, plaintiffs' counsel indicated that he would agree only to language restricting him from disclosing the settlement *amount.*

Troy Miller and Joleen Cox both testified at the hearing. Miller took the position that the parties had reached a settlement and that the degree of confidentiality desired by the law firm was typical in a legal malpractice case. Yet he was not able to identify any point where the parties in this case had come to agreement on confidentiality, and he acknowledged that confidentiality was a "material" term of the settlement. Cox testified that she wanted to be able to tell her grandchildren about the settlement. She also expressed some dissatisfaction with the tax consequences of the settlement. She further testified that there had been no agreement between the parties on confidentiality.

Thereafter, the court filed a written ruling determining that a binding settlement had been reached by the parties, and it enforced that settlement. The court reasoned,

> [T]he parties to this litigation reached a settlement of their dispute with sufficient specificity to make it binding upon them. They agreed to confidentiality. Both attorneys to this litigation are experienced litigators who have entered into confidentiality clauses in the past. It is the norm that confidentiality agreement[s] would be binding on the parties and counsel. That requirement is a common term of such agreements. Counsel for plaintiff cannot now change the rules and argue that the agreement should not be binding on

him in specific language in an agreement. The [parties'] agreement of settlement shall be enforced.

The court further concluded that the confidentiality language in the settlement should be drawn from the June 5 language that had been conditionally transmitted by Joensen and originally proposed by Harding. The court interpreted this confidentiality provision as imposing confidentiality not only on the parties themselves, but also on "their attorneys as is common in the industry."[2]

**F. The Coxes' Appeal.** The Coxes appealed, and we retained the appeal. The Coxes argue that the district court erred in enforcing the settlement agreement because there was no "meeting of the minds" concerning the confidentiality provision to be included therein. Additionally, the Coxes contend that the confidentiality provision, as interpreted by the district court, violates Harding's obligations under the Iowa Rules of Professional Conduct. The Coxes also maintain that the district court erred in sealing court documents related to the alleged settlement and in failing to arrange for an out-of-district judge to preside over the case.

**II. Standard of Review.**

Both parties agree that we should review the court's determination of a binding settlement for correction of errors at law. The district court ruled on objections during the course of the hearing on this matter. Therefore, our standard of review will be for errors at law. However, as we discuss below, our decision concerning enforceability of the settlement does not turn on disputed facts. *See Wende v. Orv Rocker Ford Lincoln Mercury, Inc.*, 530 N.W.2d 92, 94–95 (Iowa Ct. App. 1995).

---

[2]As a result of the court's enforcement of the settlement agreement, the court did not rule on the pending motion for summary judgment.

We also review claims involving the interpretation of our court rules for correction of errors at law. *State v. Kukowski*, 704 N.W.2d 687, 690–91 (Iowa 2005).

Generally, a court's decision to seal court records and a decision to deny recusal are both reviewed for abuse of discretion. *See In re Marriage of Rosenberry*, 603 N.W.2d 606, 611–12 (Iowa 1999); *State v. Millsap*, 704 N.W.2d 426, 432 (Iowa 2005).

**III. Analysis.**

**A. Enforceability of the Settlement Agreement.** We must first determine whether a valid and enforceable settlement agreement existed between the Coxes and the defendant law firm. "We have long held that voluntary settlements of legal disputes should be encouraged, with the terms of settlements not inordinately scrutinized." *Wright v. Scott*, 410 N.W.2d 247, 249 (Iowa 1987); *see also* 15A C.J.S. *Compromise and Settlement* § 21, at 96 (2012) ("[O]ral settlement agreements are binding so long as there is an offer, an acceptance, and a meeting of the minds regarding the terms of the agreement."). Nonetheless, settlement agreements "are essentially contracts, and general principles of contract law apply to their creation and interpretation." *Sierra Club v. Wayne Weber LLC*, 689 N.W.2d 696, 702 (Iowa 2004); *accord Wright*, 410 N.W.2d at 249.

Here, the Coxes maintain that no settlement agreement ever existed because there was no mutual assent concerning the agreement's confidentiality provisions. "In order to be bound, the contracting parties [to a settlement agreement] must manifest their mutual assent to the terms sought to be enforced." *Sierra Club*, 689 N.W.2d at 702; *cf. Schaer v. Webster County*, 644 N.W.2d 327, 338 (Iowa 2002) ("For a contract to be valid, the parties must express mutual assent to the terms of the

contract."). "Mutual assent is present when it is clear from the objective evidence that there has been a meeting of the minds." *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010).

With these principles in mind, we cannot find that the parties ever mutually assented to the same settlement agreement. The back-and-forth correspondence shows that the parties never got on the same page as to the confidentiality provision to be included in that agreement.

On June 4 and 5, Troy Miller (the claims adjuster), Tom Joensen (the law firm's attorney), and Marc Harding (the plaintiffs' attorney), exchanged numerous emails. In their last communications on the 5th, Joensen sent Harding a form of settlement that included Harding's proposed confidentiality language and asked Harding to "[l]et us know if you agree." Yet, both Joensen and Miller reminded Harding that the settlement was still pending the law firm's approval. *See Istari Constr., Inc. v. City of Muscatine*, 330 N.W.2d 798, 800 (Iowa 1983) (finding that an award of a municipal contract conditioned on federal government approval was not a binding contract). Thus, as of June 5, there was clearly no deal.

Harding then went away from the office for approximately ten days. When he returned on June 15, Harding communicated to Joensen that the June 5 settlement was acceptable. However, at that point, the law firm still had not accepted it. In fact, on June 16, Joensen sent Harding "another version" of the settlement on behalf of the law firm, telling him, "Your decision on whether you have your clients sign." By sending a new version, Joensen in effect terminated the pending June 5 offer. *See* Restatement (Second) of Contracts § 39(2), at 106 (Am. Law Inst. 1981) ("An offeree's power of acceptance is terminated by his making of a counter-offer, unless the offeror has manifested a contrary

intention . . . ."). Regardless, Joensen clearly did not accept the June 5 proposal at that time. *See Rick v. Sprague*, 706 N.W.2d 717, 724 (Iowa 2005) (stating that "the acceptance must conform strictly to the offer in all its conditions, without any deviation or condition whatever," or otherwise "there is no mutual assent and therefore no contract" (first quoting *Shell Oil Co. v. Kelinson*, 158 N.W.2d 724, 728 (Iowa 1968))); *Baker v. Johnson County*, 37 Iowa 186, 189 (1873) ("An offer by one party assented to by the other will generally constitute a contract, but the assent must comprehend the whole of the proposition. It must be exactly equal to its extent and terms, and must not qualify them by any new matter."); *First Am. Bank v. Urbandale Laser Wash, LLC*, 874 N.W.2d 650, 656 (Iowa Ct. App. 2015).

On June 17, Harding again communicated his willingness to enter into the June 5 proposal—but only that proposal. He set a deadline of 2 p.m. that day for acceptance. No acceptance was communicated to Harding by then. To the contrary, the law firm made another counterproposal. Hence, Harding's offer to enter into the June 5 agreement expired at 2 p.m. *See Steele v. Northup*, 259 Iowa 443, 449, 143 N.W.2d 302, 305 (1966) ("[T]he party making the offer may prescribe the mode of acceptance, and to constitute a binding contract this method must be followed."); *Ferrier v. Storer*, 63 Iowa 484, 489, 19 N.W. 288, 289–90 (1884) ("The offer, unless sooner withdrawn, stands during the time limited, or, if there is no express limitation, during a reasonable time."); Restatement (Second) of Contracts § 41(1), at 109 ("An offeree's power of acceptance is terminated at the time specified in the offer . . . ."). The parties had no deal.

Ruling otherwise, the district court found the parties "reached a settlement of their dispute with sufficient specificity to make it binding

upon them." The district court derived a settlement from the June 5 language that Harding had been willing to accept during the June 15 through June 17 time period but that the law firm had been unwilling to accept during that timeframe. That language by its terms bound only the parties to confidentiality. Yet the court nonetheless found that that language required both the parties *and* the attorneys to keep the existence and terms of the settlement confidential—the outcome desired by the law firm but not by plaintiffs' counsel.

In other words, the district court opted for the plaintiffs' language that *the defendant* had rejected, but then interpreted it as having the same effect as the defendant's language that *the plaintiffs* had rejected. While this is an elegant finesse, we do not believe contract law permits it.

We respectfully disagree with the district court's analysis, which we believe conflates three distinct concepts: (1) definiteness, (2) contract interpretation, and (3) offer and acceptance. The threshold issue that matters here is whether there was mutual assent, i.e., offer and acceptance. "For a contract to be valid, the parties must express mutual assent to the terms of the contract." *Schaer*, 644 N.W.2d at 338. Whether one ultimately interprets Harding's June 5 language as having the same legal effect as the law firm's June 16 language is a separate question from whether the parties mutually assented to either version. They didn't, and at the time both sides believed the two versions were materially different.

The fact that the law firm was willing to agree to the June 5 language months later—i.e., at the February 12, 2016 hearing—also does not establish a binding contract. By then, plaintiffs' deadline for acceptance had long passed and plaintiffs were asking for a trial setting.

To put it another way, the parties' willingness to agree to the same thing but *at different times* is not enough to establish a meeting of the minds.

Nor is the issue here one of definiteness. If the parties had reached a settlement that simply omitted any reference to confidentiality, then it might have been possible for the court to fill in a term after the fact—especially a reasonable, standard provision if such existed. *See* Restatement (Second) of Contracts § 204, at 96–97 ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."); *see also Shelby Cty. Cookers, L.L.C. v. Utility Consultants Int'l, Inc.*, 857 N.W.2d 186, 191–92 (Iowa 2014). Here, however, the parties' negotiations in June 2015 included confidentiality. Yet, the parties never got to consensus.

**B. Ethical Objection to the Settlement Agreement.** Because we find there was no binding settlement agreement, we decline to consider whether the confidentiality provision in the settlement ordered by the district court would result in a violation of Iowa Rule of Professional Conduct 32:5.6.

**C. Sealing Court Documents.** Next, the Coxes contend the district court abused its discretion in sealing portions of the court record relating to the mediation and follow-up settlement negotiations.

In several cases, we have applied the Open Records Act to the judicial branch. *See* Iowa Code § 22.1(3)(*a*) (2017) (defining "public records" to include "all records, documents, tape, or other information, stored or preserved in any medium, of or belonging to this state . . . or any branch [of state government]"); *In re Langholz*, 887 N.W.2d 770, 776–77 (Iowa 2016) (applying the Open Records Act to court records of a

particular case); *Judicial Branch v. Iowa Dist. Ct.*, 800 N.W.2d 569, 575 (Iowa 2011) (holding that court dockets are subject to the Open Records Act); *Des Moines Register & Tribune Co. v. Osmundson*, 248 N.W.2d 493, 501 (Iowa 1976) (holding "a jury list is a public record"). However, the Open Records Act also includes over sixty types of records exempted from disclosure. *Langholz*, 887 N.W.2d at 776; *see* Iowa Code § 22.7.

Notably, the Act generally exempts "[m]ediation communications as defined in section 679C.102." Iowa Code § 22.7(37). That statute defines "mediation communication" as any statement, written or oral, "that occurs during a mediation *or* is made for purposes of considering, conducting, participating in, initiating, continuing, or reconvening a mediation." *Id.* § 679C.102(2) (emphasis added). Such communications are privileged, *see id.* § 679C.104(2), and are "not subject to discovery or admissible in evidence in a proceeding unless the privilege is waived or precluded." *Id.* § 679C.104(1). Further, mediation communications "are confidential to the extent agreed to by the parties or provided by other law or rule of this state." *Id.* § 679C.108.

Hence, when mediation-related documents become part of the court record, such as when there is a dispute whether the mediation led to an actual settlement, we believe the district court can seal them. The purpose of the privilege associated with mediation, when read in conjunction with the legislature's broad definition of "communications" for purposes of chapter 679C, is clear: Parties should feel free to privately discuss the merits of pending litigation without those discussions reemerging in open court if the mediation fails. *See Wright*, 410 N.W.2d at 249 ("The law favors settlement of controversies."); *see also Miller v. Component Homes, Inc.*, 356 N.W.2d 213, 215–16 (Iowa 1984) (recognizing that a person is entitled to "buy his peace" during settlement

negotiations "without danger of being prejudiced in case his effort should fail"). Just because parties to mediation waive the privilege shielding those communications from judicial scrutiny does not mean those communications become public. *See Olam v. Congress Mortg. Co.*, 68 F. Supp. 2d 1110, 1129–39 (N.D. Cal. 1999) (discussing thoroughly the importance of mediation communications and concluding that initially accepting evidence *in camera* or under seal allows the court to "make a refined and reliable judgment" on the use of that evidence).

Here, the parties engaged in face-to-face mediation on May 29 and thereafter agreed to continue negotiating with the assistance of the mediator.[3] Once those negotiations fell through, the law firm filed its motion to enforce the settlement agreement and the Coxes resisted. In other words, there arose an issue whether the parties reached a mediated settlement of the Coxes' claim. As a result, both parties introduced, as exhibits, many documents purporting to show the outcome of the mediation process. Given this background, the district court did not abuse its discretion in sealing the court record as to any pleadings, documents, or exhibits related to the mediation and follow-up negotiations.

Moreover, the main point of contention in this case was whether the settlement agreement included a confidentiality provision and, if so, the scope of that provision. Under these circumstances, it was certainly reasonable for the court to seal the record while it determined whether the agreement was enforceable. *See LEAP Sys., Inc. v. MoneyTrax, Inc.*, 638 F.3d 216, 222–23 (3d Cir. 2011). We are also unpersuaded by the

---

[3]Although there is no evidence that the mediator actively participated in the follow-up discussions, he was included in many of the emails exchanged between Miller, Joensen, and Harding following the mediation.

Coxes' argument on appeal that the documents should have been publicly available because the law firm had already "opened the door" by filing its motion to enforce the settlement. If any party reasonably believes a confidential settlement was reached, and the opposing party disagrees, the first party should not be deterred from bringing the matter to the court's attention.

**D. Appointment of an Out-of-District Judge.** Lastly, the Coxes argue that the district court erred in not arranging for an out-of-district judge to preside over the case.

"The supreme court by and through the chief justice may at any time order . . . the transfer of active judges and other court personnel from one judicial district to another . . . ." Iowa Ct. R. 22.2. Conversely, the chief judge of a particular judicial district "may assign and monitor cases within the district," including the designation of presiding judges "within their respective districts." *Id.* rs. 22.5, .7. As the Coxes point out, often as a practical matter the chief judge of a district will request the chief justice of our court to specially assign a legal malpractice case to a judge from another district. Therefore, in this case, we turn our attention to the hearing that was conducted on the Coxes' request before the chief judge of the First Judicial District.

At that hearing, the Coxes presented virtually no evidence to support the assignment of an out-of-district judge to preside over the case, other than the fact that it had been done in other cases. Specifically, Harding stated,

> [W]hy not go ahead and bring in another judge. The problem is, I think that if there are rulings that are made in favor of the plaintiff, then there's going to be the perception that, well, the judge is bending over backwards to go ahead and help the plaintiff . . . and to avoid any appearance of impropriety, anything of that sort. On the other hand, if

> there are decisions that are made in favor of the defense, then it's going to raise questions of, well, was there some bias, or what was the situation there?

The Coxes did point out that the law firm practices primarily in Black Hawk County and further, that one of its former partners is now a judge in the First Judicial District.

On this record, the chief judge did not abuse her discretion in declining to ask for an out-of-district judge. The Coxes essentially propose a per se rule to govern cases of legal malpractice. Under this rule, a judge from anywhere in the judicial district where the defendant law firm principally practices cannot hear a legal malpractice case. The Coxes cite no authority in support of such a per se rule.[4] Here, the chief judge noted in her order that she had already considered the law firm's situs in *Black Hawk County* when she appointed a Chickasaw County judge to preside over the case.

It is also noteworthy that the Coxes raised no objection to the identity of the presiding judge at the time he was designated. Their objection came only after he had been hearing the case for approximately nine months and had ruled against the Coxes on the motion to seal.[5]

---

[4]At least two other jurisdictions have concluded that a judge is not prohibited from presiding over a legal malpractice case merely because the defendant law firm has tried cases in that judicial district in the past. *See Ex parte Atchley*, 936 So. 2d 513, 517 (Ala. 2006); *Young v. Govier & Milone, L.P.*, 835 N.W.2d 684, 697–98 (Neb. 2013).

[5]On appeal, the Coxes also argue that the district court demonstrated "clear[] bias" against them during the proceedings on the motion to enforce the settlement. The Coxes characterize several remarks made by the district court during those proceedings as a refusal to consider their arguments, having "a very low opinion" of the Coxes, and having an "animus" toward Harding. However, after reviewing the record—including the context in which these remarks were made—we do not believe the district court exhibited bias or prejudice.

Throughout the three-and-a-half hour hearing on the motion to enforce the settlement agreement, it is clear that the court's comments were primarily aimed at probing the parties' positions in a good-faith effort to reach a decision. Recusal is not required based on anything the court said at the February 2016 hearing.

*See Citizens First Nat'l Bank v. Hoyt,* 297 N.W.2d 329, 333–34 (Iowa 1980) (concluding that a party can impliedly waive the issue of judicial disqualification).

So long as adequate resources are available, we have no problem with assigning legal malpractice cases to out-of-district judges at the outset of the litigation as a precautionary measure. We simply hold that recusal was not required here.

### IV. Conclusion.

For the foregoing reasons, we reverse the order of the district court enforcing a settlement agreement between the Coxes and the law firm, we affirm the orders granting sealing of the settlement-related filings and denying appointment of an out-of-district judge, and we remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

All justices concur except Zager, J., who takes no part.