**IN THE COURT OF APPEALS OF IOWA**

No. 23-1742
Filed March 19, 2025

**ADELINA SANCHEZ,**
        Plaintiff-Appellant,

**vs.**

**GILBERT RAFAEL PALOMARES,**
        Defendant-Appellee.
_____

        Appeal from the Iowa District Court for Buena Vista County, Charles Borth,

Judge.


        A plaintiff appeals the denial of her breach-of-contract action.  **AFFIRMED.**


        Maria A. Vera of Vera Law Firm, Omaha, Nebraska, for appellant.

        Wally Miller, Jr. of Miller, Miller, Miller P.C., Cherokee, for appellee.


        Considered by Greer, P.J., and Buller and Langholz, JJ.

**BULLER, Judge.**

Adelina Sanchez appeals the district court order denying her breach-of-contract petition relating to real estate brought against her son, Gilbert Palomares. Because she attempted to modify the terms of the contract before communicating acceptance, Sanchez rejected the offer and no contract was formed. We affirm.

## I.        Background Facts and Proceedings

In 2019, Sanchez executed two quit claim deeds, transferring two properties in Storm Lake to Palomares: one on Erie Street and one on West 6th Street.[1] In 2020, Sanchez and Palomares began discussing transferring the Erie Street property back to Sanchez. Palomares had his attorney, Josh Walsh, draft a written agreement listing the conditions for the transfer; Palomares and his wife signed the drafted agreement on September 24, 2020. According to Palomares, Walsh was to provide a copy to Sanchez "for review purposes only" while Palomares wanted to be called before anything was signed. At 3:09 that afternoon, Walsh's office emailed a signed copy to Palomares's sister Isabel—who often served as English-language interpreter for their mother Sanchez. The body of the email said: "Attached you will find the Contract [Palomares and his wife] have signed. Please look it over and sign in front of a notary and bring the originals back to us." Isabel gave Sanchez a printed copy and interpreted the terms for her, but Sanchez had requests for the property.

---

[1] Sanchez offered several inconsistent reasons for doing so, which are only relevant to the extent they impacted the district court's determination Sanchez was not credible.

According to Sanchez, immediately after that they went to the notary's office, and she signed the contract. The notary testified Sanchez called sometime after 1:30, and the signing would have occurred before she picked up her son from school at 3:45 p.m. Isabel's testimony on the timing of events the afternoon of the 24th was somewhat conflicting, but the evidence shows she called Walsh's office at 4:31 p.m. Isabel claimed the purpose of the conversation was "to return the agreement to [Walsh]," and to communicate her "mother's request for the changes," which she later agreed was "a modification I was requesting on behalf of [Sanchez]." She spoke with the receptionist at Walsh's office with a correction and a request for additional conditions, including the house "should be fully furnished" and be in "good condition: carpets clean, no holes in the walls or doors, [and] no writing on the walls."

According to Walsh, the call from Isabel and Sanchez did not include an acceptance and instead was "a huge laundry list of demands . . . that were going to be done and needed to be done before she would accept anything." Walsh called Palomares saying Sanchez had refused the agreement because she wanted to add new terms. Walsh and Palomares considered the requested changes to be substantial. Palomares refused the new terms and told his attorney "the deal was off. I didn't want a deal anymore. The only thing that I would be able to do for her is deed her [the 6th Street house] and the deal was off." When Walsh was asked if the parties came to an agreement, he answered, "There was no meeting of the minds. In fact, it was anything but that. It was a total disaster crap show that devolved backwards twenty steps."

Isabel was definite that neither Palomares nor Sanchez backed off from the agreement on the 24th. According to Isabel, the next day she called to make an appointment with Palomares's attorney because Sanchez had signed the agreement. Walsh said his office did not receive a call from Isabel or anyone else to bring in the agreement with original signatures, and this was supported by the records showing no calls to his office from Isabel in the following days. Walsh noted he considered the agreement incomplete until the originals were returned to him, further explaining this was really a gift instead of a sale because there was no monetary consideration. As he pointed out, if it had been a sale, he would have used a real estate contract or purchase agreement instead of the drafted document.

On October 5, Sanchez and Isabel went to Walsh's office, where Walsh refused to accept the signed document, saying Palomares had changed his mind. Walsh thought Sanchez was there to get the deed for the 6th Street house, and Walsh told them Palomares was going to keep the Erie Street house and was only signing over the 6th Street house to Sanchez. But Sanchez was upset, saying both houses were hers. Isabel stayed behind and spoke with Walsh a bit, eventually taking the deed to the 6th Street house for Sanchez when she left. Walsh described his following interaction with Isabel, which we reproduce verbatim rather than paraphrase:

> So when they came back to pick that up, [Sanchez] stayed in the car. Her daughter Isabel comes into the office. And at that point, I said, "She's sure that she wants this house?"
> "Yep. Yep. She'll take that deed."
> I said, "Okay. As long as she understands this agreement"—and I made a dramatic deal—I said, "This agreement"—because

[Sanchez] could see me through the window—"This agreement [for the Erie Street house] is off. It's no more."

So struck the line through it because that's over, and I never had the originals from—[Sanchez] never come back. So this was—I only had half of the completed idea of this thing. And then I struck the line through it because now it's a—it was no more. Neither side were in agreement to this thing. So that's why the line is there.

As Palomares explained, he transferred the 6th Street house to Sanchez "because we did not reach an agreement" about the Erie Street house and he wanted to avoid "further problems or arguments."

Sanchez followed through with her duties under the agreement, including paying the taxes on the Erie Street house and replacing carpets and repainting the 6th Street house.[2] Sanchez did not seem to understand what holding title to the Erie Street property meant aside from the contract, at first thinking she held title and Palomares was simply not vacating the property.

Sanchez then filed a lawsuit asserting Palomares breached a contract. After a bench trial, the district court denied her claim. The court found, at best, Sanchez did not communicate her acceptance of the agreement until October 5, and that it was possible Sanchez never delivered the signed agreement to Walsh. Rather, Sanchez made demands for additional terms in the call to Walsh on September 24 instead of communicating an acceptance. The court found Palomares withdrew his offer and Sanchez could no longer communicate her acceptance of the original terms, so no binding contract was formed. Sanchez appeals.

---

[2] Palomares testified he tried to pay the taxes but they had already been paid.

## II.    Standard of Review

We review equitable cases de novo.  Iowa R. App. P. 6.907.  We give weight to the trial court's fact-findings, especially as to credibility of the witnesses, but are not bound by them.  Iowa R. App. P. 6.904(3)(g).

## III.    Analysis

Sanchez argues that she signed the agreement between 3:09 and 3:45 p.m. on September 24, which she claims was a binding acceptance, and the call to Walsh at 4:30 p.m. "was an expression and delivery of acceptance and a mere inquiry as to the possibility of adding some terms."  On our de novo review, and giving some consideration to the district court's fact- and credibility-findings, we disagree.  The testimony Sanchez claims "was a definite expression of acceptance and delivery" actually conveyed a "request for the changes" and was "a modification" of the agreement—not an acceptance.

Even if we accept Sanchez's asserted timing regarding when she signed the agreement, she did not convey that she had accepted.  "A mere private uncommunicated assent will not effect a contract."  *Heartland Express, Inc. v. Terry*, 631 N.W.2d 260, 270 (Iowa 2001) (cleaned up); *First Am. Bank v. Urbandale Laser Wash, LLC*, 874 N.W.2d 650, 655 (Iowa Ct. App. 2015) ("Acceptance must be communicated or delivered.").  And the email providing the agreement to her required Sanchez to "sign in front of a notary *and bring the originals back to us.*" (Emphasis added.)  Sanchez's attempt to return signed documents to Walsh's office did not happen until October 5.

This delay in acceptance is critical.  When Isabel called Walsh on September 24, she provided a list of requested changes to the original

agreement—termed "conditions" on the memo to Walsh. This call was a rejection or counter-offer, not an acceptance. *See Flanagan v. Consol. Nutrition, L.C.*, 627 N.W.2d 573, 578 (Iowa Ct. App. 2001) ("[A]t common law an offer has to be accepted exactly as is or the response amounts only to a counter-offer." (cleaned up)); *Hayne v. Cook*, 109 N.W.2d 188, 193 (Iowa 1961) ("[A] conditional acceptance is not an acceptance at all, but is merely a counteroffer, and the contract would not be binding until the new offer had been received and acted upon by the original offer[o]r."). Once Sanchez's demands were communicated as the response to the offer instead of acceptance, it terminated her ability to accept the original offer. *Est. of Cox v. Dunakey & Klatt, P.C.*, 893 N.W.2d 295, 302–03 (Iowa 2017); *see also Rick v. Sprague*, 706 N.W.2d 717, 724 (Iowa 2005) ("[T]he acceptance must conform strictly to the offer in all its conditions, without any deviation or condition whatever. Otherwise there is no mutual assent and therefore no contract." (cleaned up)); *First Am. Bank*, 874 N.W.2d at 656 (finding no contract where accepting party agreed to most but not all of the terms).

Because Sanchez proposed conditions or additional terms for the contract, she rejected Palomares's offer, and Palomares did not have to formally withdraw the offer or take any other action. And because Palomares did not accept the conditions offered by Sanchez in her counter-offer, no contract was formed. Because Sanchez's statute of frauds argument was neither raised nor decided below, we do not address it here. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("[I]ssues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). We affirm.

**AFFIRMED.**