**IN THE COURT OF APPEALS OF IOWA**

No. 23-1171
Filed April 9, 2025

**STANLEY JAMES HOLT and ANGELA SUE HOLT,**
    Plaintiffs-Appellees,

**vs.**

**RILEY McDERMOTT,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Delaware County, Mark R. Lawson (settlement agreement) and Melissa A. Anderson-Seeber (easement), Judges.

Riley McDermott appeals from rulings on a settlement agreement and an easement. **REVERSED AND REMANDED.**

Michael D. Currie (argued) and Jodie McDougal of Fredrikson & Byron, P.A., Des Moines, for appellant.

Richard F. Mitvalsky (argued) of Gray, Stefani & Mitvalsky, P.L.C., Cedar Rapids, for appellees.

Heard at oral argument by Schumacher, P.J, and Badding and Chicchelly, JJ.

**SCHUMACHER, Presiding Judge.**

Ongoing disputes between lake-front neighbors, Riley McDermott and Stanley and Angela Holt (the Holts), bring this case before our court. McDermott appeals two orders by the district court: one declining to enforce a settlement agreement between the parties and one finding a fence McDermott erected "was a clear violation of the express easement that had been in existence since 1981." Upon our review, we reverse and remand.

I.      **Background Facts and Proceedings**

McDermott and the Holts own neighboring lakefront, single-family homes in Delhi. The Holts purchased their property on Lake Delhi in 2003, and it serves as their primary residence. Not long after they purchased the property, the Holts placed a carport directly to the west of their existing garage. The prior owner of the McDermott property informed the Holts that a portion of their carport was on his property. But the owner took no action to have the Holts remove it. McDermott purchased the lot directly west of the Holt property in 2013. McDermott uses his property recreationally, but he "has plans for it to be [his] permanent residence." At the time of his purchase, the owner informed McDermott of the encroaching carport that had been erected by the Holts.

Travis Niehaus owns the lot directly east of the Holts. All three lots have a steep slope toward Lake Delhi. The only road access to the lots is via a private driveway known as 263rd Street, which connects them to a Delaware County public road, 230th Avenue. The properties' boundary lines are shown below; 263rd Street runs horizontally through the lots:



Since 1981, all original and subsequent owners of the three lots have used 263rd Street to access their respective properties pursuant to a Joint Driveway Easement, which was filed with the Delaware County Recorder in March 1982. The easement provides, in relevant part:

> Whereas, the parties hereto desire to create for themselves, their heirs, successors and assigns, a joint driveway easement as the same is now situated on 3 parcels of land referred to above.
>
> Now, therefore, in consideration of the mutual promises and obligations and rights herein created, do hereby grant, give and convey unto each other and unto their heirs, successors and assign a right-of-way or easement over, along, and across a driveway which presently exists on their respective properties and is presently being used as an access road by the parties to their property.
>
> The joint driveway or easement thus created shall be for the joint use of the parties hereto and for their heirs, successors and assigns, for joint driveway purposes for pleasure vehicles and trucks not over one (1) ton capacity. No party hereto, their heirs, successors or assigns, shall so use or leave any vehicle, or anything else on said driveway so as to prevent the free and uninterrupted use of said driveway by the other parties for the purpose for which this joint driveway easement was created.
>
> NONE of the parties hereto, their heirs, successors or assign shall use this joint driveway, or easement for commercial use.
>
> Each of the parties hereto, their heirs, successors or assign shall bear one-third of the cost of maintaining said driveway in a reasonably good condition, and such cost of maintenance shall include reconstruction when reasonably necessary. Notwithstanding the above provisions, any party causing damage to said driveway through negligence on the part of the party themselves or others for

them or on their behalf shall be wholly responsible for any such damage resulting from any such negligence.

Any of the parties hereto, their heirs, successors or assigns shall have the right to do such work on said driveway and make such repairs thereon as are reasonably necessary to maintain said driveway in a reasonably *good* condition, and upon the completion of such repairs, the parties making such repairs shall be entitled to recover from the other parties two-thirds of the cost thereof.

This agreement shall be deemed to be a covenant running with the title to the land and shall be binding upon the parties hereto and upon their heirs, successors and assigns, so long as any of said above described lots are used for private residence purposes and provided, however, that this easement may be released at any time by appropriate agreement for that purpose entered into between the owners of said lots, duly executed and acknowledged and filed for record in the office of the recorder of Delaware County, Iowa.

At some point after McDermott purchased his property in 2013, Niehaus decided to build a new home farther south on his lot. The Holts and McDermott agreed to allow Niehaus to change the contour of 263rd Street to "come around further up [the] hill" to accommodate the location of Niehaus's new home. As a result of the changes, the incline of 263rd Street became very steep. McDermott excavated, raised the elevation of his property, and built a retaining wall. The parties then had to install culverts for water drainage. The curved thick line below shows the new location of 263rd Street:



The driveway's new terrane exacerbated tensions that were already escalating between the parties during the first few years after McDermott purchased his property. As noted, McDermott learned from the prior owner of his lot that the Holt carport was partially on his property.[1] In 2016, McDermott decided to address the issue and entered into a Temporary Use Agreement with the Holts, which provides in relevant part:

> WHEREAS, McDermott is willing to give temporary use over his property for the purposes of Holt having access to storage and use of a car port structure owned by Holt.
> This specifically does not grant a permanent easement and is only for the purposes of the current owners [Holt] for purposes of the use and access of the property owned by McDermott.

McDermott also expressed concerns about the Holts and their guests parking, driving, and otherwise encroaching on his property. McDermott also took issue with the Holts using his property for target practice. At one point, the Holts paid McDermott $1500 to repair damage to a well on the west side of McDermott's lot. The Holts maintained, however, that they needed to drive partially onto McDermott's lot to access their carport, consistent with their use under the easement over the years.

Meanwhile, the Holts learned from Delaware County officials that they needed to move their septic system due to the new location of 263rd Street. In 2017, the Holts constructed the new septic system and expanded their upper level parking in the area between their home and 263rd Street. A large retaining wall

---

[1] Angela Holt used the carport to park her car. The Holts also "sometimes" used it to store their boat trailer. The Holts agreed that the prior owner informed them the carport "might be on part of his land" but did not request they move it.

was needed to support the area that had to be built up for the septic system,[2] which further impeded access to the carport. Around this time, McDermott constructed a privacy fence between the parties' properties. The fence angles near the carport, provides a narrow path along the retaining wall, and extends to 263rd Street:





---

[2] Angela testified, "The only reason why we put in that new block wall and all of that was because we had to put in a new septic system, or we wouldn't have even done that"; "all I remember is hearing five feet, you have to keep your septic—has to stay warm. And then they also had to get insulation to put around it . . . ."

The neighborhood disagreements came to head in May 2018, when the Holts filed this lawsuit against McDermott, raising various claims and generally alleging McDermott's fence violates the Joint Driveway Easement and "interferes with the [Holts'] access to their property, particularly entry and exit from their garage." McDermott answered and filed a counter-claim for damages for an alleged assault committed against him by Angela.

The matter proceeded to the scheduled trial date in December 2018. Prior to taking evidence, the court was informed that the parties had reached a settlement agreement in which McDermott would purchase the Holt property for $250,000 and McDermott would dismiss his counterclaim. The parties entered the agreement on the record and trial was cancelled. The court confirmed with all parties their understanding of the agreement.

The Holts later refused to go through with the sale. Angela called a friend who was a realtor and told her, "Stan and I are in trouble. We don't know what to do. Would you please come over and tell us what to do?"

Counsel for the Holts later moved to withdraw, citing Iowa Rule of Professional Conduct 32.1.16(b)(6) and stating "further disclosure of which grounds might be injurious to his client's interest." The Holts retained new counsel and filed a motion to reset trial, claiming

> their participation in settlement discussions, and the formation and/or consummation of any perceived agreements on December 6, 2018, were defective, were not freely or knowledgeably made by them, and were not voluntarily made of their own free will, but were instead induced by and the product of surprise, shock, unfair duress, and misrepresentation or concealment.

The Holts further alleged "a full, enforceable agreement was never achieved" because "discussions held on the morning of trial did not address several terms material to the sale of real estate property." McDermott resisted and moved for the court to enforce the parties' settlement agreement. McDermott urged that the transcript of the December 6 court proceeding "clearly shows" "both the terms of the agreement and the intent of the parties." The Holts countered, maintaining the statute of frauds precluded the use of the transcript to prove an agreement to sell real estate.

Following a hearing that was held about two years after the original trial date, the district court entered an order finding "[t]he statute of frauds does not bar McDermott from using the court transcript in his attempt to establish an oral contract for the sale of real estate." But the court concluded even considering the transcript, McDermott "failed to establish the existence of such an oral contract by clear, satisfactory, and convincing evidence." Accordingly, the court granted the Holts' motion to reset trial and denied McDermott's motion to enforce the settlement agreement. McDermott filed an application for interlocutory appeal of the court's order, which the supreme court denied.

The easement case proceeded to trial over two days in August 2022, during which the court received exhibits and heard testimony from Angela and Stanley Holt; McDermott and his brother, Cody McDermott; and licensed land surveyor, Randall Rattenborg. At the outset of its order, the court observed the parties "agree that an easement to allow for access to their respective properties continues to be necessary." The court found the original easement in this case "continues to exist, even with the change in the location of the driveway." The

court observed, however, that while the easement affords the parties "reasonable" and "safe" access to their property, it does not "create essentially a cul-de-sac on [McDermott's property] which would allow any person to use McDermott's property to turn around."

Ultimately, the district court concluded "the fence erected by McDermott clearly violates [the] expressed driveway easement" and "is on land covered by the easement." Accordingly, the court ordered McDermott to "immediately remove the fence from its current position at his cost." However, the court found McDermott "shall be allowed to erect a fence to E prime as shown in [the picture below] as a means of privacy and prevention of future neighborhood strife":



Finally, the court ordered:

> The Holts shall refrain from traveling onto McDermott's property any more than is necessary to safely gain access to their property, including their carport. In no situation shall the Holts enter onto McDermott's property with their vehicle and attached trailer to turn around, unless they first obtain McDermott's permission. The [Holts'] vehicle can travel onto the property only as much as it takes to back a trailer down to their lower level.

McDermott filed a motion for enlarged findings and modification under Iowa Rule of Civil Procedure 1.904(2), which the court denied.

McDermott appealed. He also requested a stay of the district court's order, which the supreme court denied. Additional facts relevant on appeal will be discussed below.

## II. Settlement Agreement

McDermott first challenges the district court's denial of his motion to enforce the alleged settlement agreement between the parties. We review a motion to enforce a settlement agreement for correction of errors at law. *Freer v. DAC, Inc.*, 929 N.W.2d 685, 687 (Iowa 2019). "The district court has authority to enforce settlement agreements made in a pending case." *Id.* (quoting *Gilbride v. Trunnelle*, 620 N.W.2d 244, 249 (Iowa 2000)).

On the morning of the originally scheduled trial, the court was advised that the parties had reached a settlement. The following colloquy took place on the record:

> COURT: The Court is aware of the fact that the parties, with the assistance of counsel, have engaged in some discussions this morning; and it's my understanding that possibly a resolution of issues has been reached. If that is the case, I'm going to ask that one of the attorneys state on the record his understanding of the agreements. I'll then ask opposing counsel to confirm that that's an accurate statement or to supplement it, if necessary.
>
> Once we have all agreements on the record, I will then be speaking to each of the parties to confirm that this reflects your understanding of an agreement and that you are, in fact, in favor of this type of action, course of action.
>
> With that in mind, do I have a volunteer from the attorneys?
>
> COUNSEL FOR HOLTS: Your Honor, I can tell you that, through negotiations, we've agreed to dismiss the case. We've settled it on the basis of Mr. McDermott is going to purchase the property from Mrs. Holt and Mr. Holt. [McDermott's counsel] is going

to draw up a purchase agreement. It will reflect that the sales price is $250,000. The closing will be July 1, 2019.

The Holts will be able to keep the carport, the shed, and the things that go out into the water, the docks, as part of the agreement. There also—The issue with the fence, the Holts will be able to take down the fence this winter at their cost, preserving the fence as best as they can for Mr. McDermott once the sale is concluded. The Holts agree that between now and when they move, they will not utilize Mr. McDermott's property for parking; and they also understand that there won't be any easement necessary now because Mr. McDermott will adjoin—have two adjoining properties.

He might have to have an easement agreement with a party not currently present. I would say we could probably have something submitted to the Court in thirty days that memorializes our entire agreement.

COURT: Okay. With that in mind, is it your proposal then that there be some type of review hearing set in approximately thirty days to see if appropriate documents have been filed, specifically a dismissal, I guess?

COUNSEL FOR McDERMOTT: That would be correct. We'll dismiss our counterclaim also, Your Honor, and I'll get the purchase agreement to [the Holts' counsel] within the next couple of days. So we'll get one to him right away.

COURT: Court costs? That's part of my job is to ask about that.

COUNSEL FOR McDERMOTT: Probably would divide them.

COUNSEL FOR HOLTS: That's fine.

COURT: Are both counsel then of the opinion that this reflects the terms of the agreement? . . .

BOTH COUNSEL: [(Agreeing.)]

COURT: At this point, I would like to speak to the parties themselves. Do I have Angela Holt?

ANGELA HOLT: Yes.

COURT: Ms. Holt, the statements made by the attorneys as they outlined the agreements reached, was this consistent with your understanding of the agreements?

ANGELA HOLT: Yes, it was.

COURT: And are you, in fact, in favor of this course of action?

ANGELA HOLT: Yes.

COURT: Is it Stanley Holt?

STANLEY HOLT: Yes.

COURT: Mr. Holt, have you also this morning had an opportunity to hear the statements of the attorneys—

STANLEY HOLT: I have.

COURT: —as they summarized their understanding of the agreements reached?

STANLEY HOLT: I have.

COURT: And the statements made by the attorneys, is this consistent with your understanding of the agreements?

STANLEY HOLT: Yes.

COURT: And are you also in favor of this course of action that's been outlined to the Court?

STANLEY HOLT: I—I'm blown away. I just—I am shocked by it. I had—This is just something I just didn't expect.

COURT: But are you in agreement with the sale of the—of the real estate on these terms?

STANLEY HOLT: Well, I'm not crazy about it.

COURT: Pardon?

STANLEY HOLT: I'm not crazy about it. I love it where I'm at.

COUNSEL FOR HOLTS: You have to answer whether you're—

STANLEY HOLT: Yes.

COURT: Keep in mind, we're all here today for a trial, and we can certainly go to trial; but are you telling me then you are in agreement with this proposed disposition?

STANLEY HOLT: Yes.

COURT: Riley McDermott, is it?

McDERMOTT: Yes, Your Honor.

COURT: Mr. McDermott, have you also had an opportunity this morning to hear the statements of the attorneys as they outlined to the Court the agreements reached to resolve the issues surrounding this case?

McDERMOTT: Yes, Your Honor.

COURT: The statements made by the attorneys, is this consistent with your understanding of the agreements reached?

McDERMOTT: Yes, Your Honor.

COURT: And are you also in favor of this course of action as a resolution of issues?

McDERMOTT: Yes, Your Honor.

COURT: And do you also realize that, if you were not in agreement, you could proceed to trial?

McDERMOTT: Yes, Your Honor.

COURT: Maybe that's a question I should ask you as well, Ms. Holt. I don't think I did specifically ask you. But are you aware of the fact that, if you didn't like these agreements, we're all here today and trial has been set, you could, in fact, proceed to trial?

ANGELA HOLT: Yes, I understand. I—

COURT: And knowing—I'm sorry. I didn't mean to interrupt.

ANGELA HOLT: No. Go ahead.

COURT: Knowing you have the right to proceed to trial, do you still agree with this course of action, these settlement agreements that were earlier explained to the Court?

ANGELA HOLT: Yes, I am. But, you know, it is—like my husband said, it is kind of a shock to us, you know.

COURT: Okay. But is anyone forcing you to accept these terms?

ANGELA HOLT: No, they're not.

COURT: So, again, are you accepting this—the terms of this settlement, which include the sale of your real estate?

ANGELA HOLT: Yes.

COURT: Okay. Do either counsel desire further record about the settlement reached? . . .

BOTH COUNSEL: [(Indicating no.)]

COURT: As I understand it then, what I'll do is set kind of a status review hearing in approximately thirty days for whoever is the court service day judge here in Delaware County at that time. From my understanding of the agreements that, if everything has been memorialized, that judge could expect to see a dismissal of the plaintiffs' original action as well as a dismissal of the counterclaim.

If those filings are there, that would obviously eliminate the need for any type of review. If one or both are not there, I mean, if there's something missing, then I do expect counsel to do a telephone conference call with the district court judge to explain where they're at, if more time is needed, just to offer an explanation as to where the case is going so we don't lose track of it.

I do commend the parties and counsel for the efforts made to resolve the issues. I'm always a firm believer that it's easier for parties to live with an agreement that they craft themselves, that they have input in, rather than just relying on a judge to evaluate what limited evidence may be available to that judge.

. . . .

Thank you. The proceeding is concluded.

That same day, the court entered an order setting a status conference for approximately seven weeks later. The court's order stated:

Trial was scheduled this date of December 6, 2018, on Plaintiffs' petition and Defendant's counterclaim. The parties appeared with counsel of record. Prior to commencement of trial, the parties and counsel engaged in settlement discussions and, in fact, reached a resolution of issues. The resolution reached was placed on the record and confirmed by the parties. Counsel requested approximately thirty days to prepare necessary documents to implement the settlement reached this date.

IT IS THE ORDER OF THE COURT trial scheduled this date of December 6, 2018, is CANCELLED. The parties shall proceed to finalize their settlement of issues. The Court understands that, upon execution of necessary documents to finalize settlement, both parties will be filing a dismissal of their respective claims and sharing court costs of the action.

> The status of the case and its settlement will be reviewed by the Court with counsel January 29, 2019, at 9:00 a.m. . . .
> If the parties have executed necessary settlement documents and their dismissals are on file, status review hearing is automatically cancelled without further order of Court.

Within several days of the settlement, McDermott's counsel sent a four-page standard Iowa Bar form purchase agreement to the attorney for the Holts. The Holts did not respond, and the status conference was continued on three occasions. The Holts obtained new counsel and moved to reset the trial date. McDermott resisted and moved to enforce the settlement agreement. The district court denied the motion to enforce the settlement agreement and re-set the trial, ultimately ruling that McDermott's fence was in violation of the express easement agreement. On appeal, McDermott challenges the court's denial of his motion to enforce the parties' settlement agreement and the court's ruling on the express easement agreement.

Iowa courts "have long held that voluntary settlements of legal disputes should be encouraged, with the terms of settlements not inordinately scrutinized." *Est. of Cox v. Dunakey & Klatt, P.C.*, 893 N.W.2d 295, 302 (Iowa 2017) (citation omitted). This includes "oral settlement agreements[, which] are binding so long as there is an offer, an acceptance, and a meeting of the minds regarding the terms of the agreement." 15A C.J.S. *Compromise and Settlement* § 21 (2012); *accord Cox*, 893 N.W.2d at 302. However, "settlement agreements 'are essentially contracts, and general principles of contract law apply to their creation and interpretation.'" *Cox*, 893 N.W.2d at 302 (quoting *Sierra Club v. Wayne Weber LLC*, 689 N.W.2d 696, 702 (Iowa 2004)). "The intent of the parties controls the interpretation issues. In order to be bound, the contracting parties must manifest

their mutual assent to the terms sought to be enforced." *Sierra Club*, 689 N.W.2d at 702. "Mutual assent is present when it is clear from the objective evidence that there has been a meeting of the minds." *Cox*, 893 N.W.2d at 303 (quoting *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010)).

McDermott asserts "[t]he parties mutually assented to the December 6, 2018 settlement." McDermott adds the fact that some terms of the contract were not discussed or expressly agreed to is of no significance "because the parties expressly agreed that McDermott's attorney would provide a purchase agreement at a later time"; "[t]he same is true of the many provisions contained in the purchase agreement that were necessary to effectuate and carry out the agreed upon settlement terms." McDermott contends the transcript of the "settlement stipulation" "provides indisputable objective evidence that satisfies all the essential elements of contract creation."

Indeed, "[s]ettlement agreements are not required to be in writing." *Cusick v. Cooper*, No. 23-0377, 2024 WL 707464, at *2 (Iowa Ct. App. Feb. 21, 2024). However, the court can only enforce such an agreement "if the important facts are not in dispute." *Id.* "[A] settlement agreement, like any binding agreement, 'must be definite and certain in order to be given legal effect.'" *Arch v. White*, No. 18-0827, 2019 WL 719186, at *3 (Iowa Ct. App. Feb. 20, 2019) (quoting *Palmer v. Albert*, 310 N.W.2d 169, 172 (Iowa 1981)). Specifically, "for an oral contract to be found and enforceable, the terms must be so definitely fixed so that nothing remained except to reduce the terms to writing. An oral contract must be established by clear, satisfactory, and convincing proof." *Qwest Bus. & Gov't*

*Servs. v. Lawchek, Ltd.*, No. 09-0597, 2010 WL 624905, at *3 (Iowa Ct. App. Feb. 24, 2010).

On this issue, the district court found:

> From a consideration of the objective evidence, the Court finds McDermott failed to prove by clear, satisfactory and convincing evidence that the parties reached an agreement on all terms of an oral contract to purchase real estate.
>
> First, there is the discussion in chambers. At the beginning of the conference Judge Lingreen stated: "The Court is aware of the fact that the parties, with the assistance of counsel, have engaged in some discussions this morning; and it's my understanding that *possibly a resolution of issues has been reached.*" This lends a tentative tone to the proceedings. After dictating the alleged agreement into the record, and stating that McDermott's attorney would be preparing a purchase agreement, plaintiffs' counsel said, "I would say we could probably have something submitted to the Court in thirty days *that memorializes our entire agreement.*" This implies there were additional terms necessary to finalize an agreement.
>
> In discussing the need for a status conference to determine if dismissals were filed, Judge Lingreen said, "From my understanding of the agreements that (sic), *if everything has been memorialized,* that judge could expect to see a dismissal of the plaintiffs' original action, as well as a dismissal of the counterclaim." She also stated that at the status review, the attorneys could "explain where they're at, if more time is needed, just to offer an explanation as to where the case is going so we don't lose track of it." Again, these statements imply a tentative agreement that may or may not come to fruition.
>
> Judge Lingreen did not tell the parties that the purported settlement was binding; that the alleged agreement could be enforced by either party as dictated into the record; or what would happen if the documents to be prepared in the future were not signed. She did not tell the parties they were giving up their right to a trial in the future by dictating an agreement into the record that day.
>
> Judge Lingreen freely admitted in her testimony that it was not her role to approve any settlement agreement that was reached. She acknowledged she did not know what terms were discussed outside her presence or what was agreed to there. She testified the attorneys elected to put a few terms on the record. She admitted that she may or may not have known all the settlement terms. She candidly acknowledged that the agreement was not submitted to her for approval, and that the Court's sole function was to insure that dismissals were filed once the agreement was consummated.

Next, the purchase agreement prepared by McDermott's attorney contained a number of terms that had not been discussed. All of these terms placed burdens on the Holts that it is not clear they understood. This would include various costs, such as abstracting, transfer stamps, and tax proration. Other provisions carried the risk of much bigger financial liability for the Holts. The purchase agreement included a provision that they remove an existing septic system they had just installed.[3] It included a provision that they warrant that the "plumbing, heating, cooling, electrical systems, and appliances" be in working order at the time of closing. The purchase agreement specified that the Holts bore the risk of loss or damage to the property prior to closing. Finally, the purchase agreement obligated them to remove all debris and personal property from the premises prior to closing. It is undisputed that none of these terms were discussed—on or off the record—on December [6], 2018.

In addition, no earnest money was paid. The cases were not immediately dismissed that day. Everything was couched in terms of a purchase agreement that would be forthcoming.

. . . .

McDermott's request for specific performance of an oral contract to convey real estate must fail.

(Citations to the record and footnote omitted.)

The district court contrasted the facts and circumstances presented here from the situation in *Severson v. Elberon Elevator, Inc.*, 250 N.W.2d 417 (Iowa 1977). In that case—which also involved a request for specific performance of an agreement to purchase real estate—the supreme court found "the following contract terms were established":

[Plaintiff] was to pay defendant $50,000 for the physical assets of defendant exclusive of inventory. Defendant's stock was not included. An April 1, 1973, date of possession was agreed on, but was not of the essence of the agreement. Defendant assured [plaintiff] existing insurance coverage of the assets was adequate and agreed to maintain it until transfer of possession. Property taxes

---

[3] McDermott takes issue with the court's statement that the purchase agreement provided the Holts would remove their septic system. The purchase agreement states: "Seller may keep and remove from the property the carport, shed, all boat docks, and septic system above the home." We agree with McDermott that the contract language can be interpreted to provide the Holts discretion to remove the septic system. We do not give weight to the court's interpretation of this provision.

> were to be apportioned. Defendant promised to comply with the bulk sales law. Defendant was to show marketable title and transfer the real estate by warranty deed and assign its lease with the railroad. [Shareholder of defendant] was to terminate the employment of the elevator manager, while other employees were to be retained. [Plaintiff] was to handle movement of such grain as remained in the elevator as of possession date, upon request of defendant, in consideration of customary charges for that service. Defendant was to retain and carry out its own obligations on warehouse receipts and grain contracts. [Plaintiff] paid defendant $5000 to bind the bargain. He noted on his check that it represented ten percent earnest money on a $50,000 "purchase price."

*Severson*, 250 N.W.2d at 420. The supreme court further found several items not agreed upon—such as whether the plaintiff had obtained financing or consent from the railroad for assignment of the lease—were "not essential contract elements." *Id.* Significantly, the court noted the parties "involved in these negotiations were skilled, experienced businessmen and fully understood the implications of what they agreed upon," and "[n]either party had any advantage over the other." *Id.* at 421.

> The district court compared the facts of *Severson* to this case:

> Contrast [*Severson*] with the present situation. The parties were not experienced in real estate transactions, or at least the Holts were not. A purchase price and closing date were agreed to. However, there was no discussion of existing insurance coverage or risk of loss, no discussion of proration of property taxes, and no discussion of marketable title or transfer by warranty deed. There was no earnest money payment. There was no discussion about the condition of mechanical systems or the removal of an existing septic system. These were essential elements of the contract.

We disagree and conclude McDermott provided clear, satisfactory, and convincing evidence of an oral contract. As reflected by the transcript, the parties agreed on the material terms of the contract in December 2018. *See Cox*, 893 N.W.2d. at 302 (noting for an oral settlement agreement to be binding there must

be "a meeting of the minds regarding the terms of the agreement" (quoting 15A C.J.S. *Compromise and Settlement* § 21, at 96)). *Compare Qwest*, 2010 WL 624905, at *3 ("[A]t all times throughout the parties' negotiations, Shull understood (1) Qwest did not intend to be bound by the terms of a proposed settlement agreement until Qwest received updated financials or loan information from Lawchek; (2) she was not able to complete an agreement with Lawchek until she had received written authority from her superiors; and (3) Qwest could not be bound be the agreement until a written settlement agreement or release was signed."), *with McNeal v. Wapello Cnty.*, 985 N.W.2d 484, 493 (Iowa 2023) (finding a settlement agreement that "lays out a series of steps that will occur" was definite and enforceable because "each of the steps imposes substantive requirements" agreed to by the parties) *and Cusick*, 2024 WL 707464, at *3 ("The exhibits themselves detail the material terms of the agreement, including a four-page draft settlement agreement that included provisions such as the agreement conditions, consideration, required performance, and resolution of the trial proceedings.").

Both McDermott and the Holts had settlement authority and reached an agreement on the material terms of the oral contract. Both parties were represented by counsel and confirmed their understanding of the agreement on the record. And the details included in the purchase agreement were not material terms to the sale of the real estate. Both agreed as to the resolution of the proceedings.

We conclude a settlement agreement was reached in December 2018. As such, we reverse the district court's determination and remand for the entry of an order of enforcement as to the settlement agreement. And because the resolution

of the settlement agreement issue is dipositive of the appeal, we do not address McDermott's claim on the enforcement of the easement or McDermott's counterclaim.

**REVERSED AND REMANDED.**